**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action No. 23-11331** |
| **v.** | |
| **JOSEPH A. PADILLA and KEVIN C. DILLS,** | **JURY TRIAL DEMANDED** |
| **Defendants,** | |
| **and** | |
| **BRIGHT STAR INTERNATIONAL, INC., LIFE SCIENCES JOURNEYS, INC., CARLOS HERNANDEZ, JAMIE QUICK, ASHLEY ROBINSON, AND ARLENE SANDOVAL,** | |
| **Relief Defendants.** | |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Joseph A. Padilla ("Padilla") and Kevin C. Dills ("Dills") (together, "Defendants"), and relief defendants Bright Star International, Inc. ("Bright Star"), Life Sciences Journeys, Inc. ("Life Sciences"), Carlos Hernandez ("Hernandez"), Jamie Quick ("Quick"), Ashley Robinson ("Robinson"), and Arlene Sandoval ("Sandoval") (together, "Relief Defendants"):

## SUMMARY

1.      From at least February 2020 through August 2022, Padilla engaged in a fraudulent scheme to sell stock to the public.  Padilla knowingly enabled illegal stock sales by

people or groups of people (hereafter, "Control Persons") who secretly held enough of the stock of various small publicly-traded companies to dominate the market for their stock. Padilla referred to the Control Persons as his "clients." Padilla provided a layer of disguise to his clients who, acting in concert with Padilla, intended to defraud investors by amassing and then selling large quantities of stock in circumvention of registration and disclosure requirements imposed by the federal securities laws. Those registration and disclosure requirements, which Padilla and his clients took pains to avoid, are critical safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

2.     Padilla took multiple steps in his scheme to sell his clients' shares to investors in the public securities market, and then to surreptitiously return the proceeds to his clients. Padilla hid his clients' identities by selling stock for them through offshore brokerage accounts that he controlled, but that he opened in different names. His clients' stock sales took place during periods of increased investor demand driven, at least in part, by online articles, email newsletters, or other promotional activity designed to generate investor interest. Padilla supported his clients' stock sales by manipulating stock prices through trading in his own U.S. brokerage account and the U.S. brokerage accounts of his friends and family. Padilla also enlisted in his scheme a professional stock trader at a U.S. brokerage firm to secretly facilitate large stock sales by Padilla's clients.

3.     Dills conspired with Padilla to sell stock of a company that Dills secretly controlled, while avoiding legal requirements for a control person's sale of stock to the public. Dills provided stock for Padilla to sell to the public by transferring shares to individuals who Padilla used as fronts (or "nominees"), and Padilla then returned the proceeds to Dills via a

circuitous route through foreign bank accounts in the names of the individuals who he used as fronts.  Dills received approximately $20 million from the scheme, in accounts in the names of two front companies that he also controlled -- the relief defendants Bright Star and Life Sciences.

## VIOLATIONS

4.      By virtue of the conduct alleged herein, Padilla and Dills violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77e(a), 77e(c), 77q(a)(1), and (3)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§240.10b-5(a) and (c)] thereunder.  Dills also aided and abetted Padilla's violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act, and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

5.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].

6.      The Commission seeks against Defendants a permanent injunction, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, under Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(5) and (7)], civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; orders barring Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C.

§78u(d)]; orders enjoining Defendants from directly or indirectly participating in the issuance,

purchase, offer or sale of any security, provided, however, that such injunction shall not prevent

them from purchasing or selling securities listed on a national securities exchange for their own

personal accounts; and such other relief as the Court may deem appropriate.  The Commission

seeks against Relief Defendants disgorgement of their ill-gotten gains together with prejudgment

interest, and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and

22(a) of the Securities Act [15 U.S.C. §§77t(d)(1) and 77v(a)] and Sections 21(d), 21(e), and 27

of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].  Venue lies in this district pursuant to

Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15

U.S.C. §78aa].  A portion of the acts, practices, transactions and courses of business alleged in

this Complaint occurred within the District of Massachusetts.  Individuals who resided in this

district purchased shares of the stock at issue during the Defendants' fraudulent scheme.

8.      In connection with the transactions, acts, practices, and courses of business

alleged in this Complaint, Defendants, directly or indirectly, singly or in concert, made use of the

means or instrumentalities of transportation or communication in interstate commerce, or the

mails.

## DEFENDANTS

9.      **Joseph A. Padilla**, age 54, is a United States citizen who has held permanent

resident visas in Mexico and Russia.  He has maintained residences in Carlsbad, California and

Cabo San Lucas, Mexico.  On March 21, 2023, Padilla was indicted for conduct related to his

conduct alleged herein. *United States v. Padilla, et al.*, 1:23-cr-10075-RGS (Dkt. No. 38).  From

June 2007 to August 2011, Padilla was a registered representative of registered broker-dealer Scottsdale Capital Advisors Corp.  Prior to that, he was a registered representative of several other registered broker-dealers, dating back to 1991.  On December 16, 2011, the Commission brought a civil injunctive action against Padilla and others in connection with a stock selling scheme.  *SEC v. Ruettiger, et al.*, Civil Action No. 2:11-CV-02011 (D. Nev., filed Dec. 16, 2011).  In that case, the Commission alleged that Padilla violated Sections 5(a) and 5(c) of the Securities Act.  The Commission alleged that participants in the stock selling scheme made false and misleading statements in company press releases and promotional materials, engaged in manipulative trading to artificially inflate stock prices, and sold unregistered shares to investors.  The Commission also alleged that Padilla facilitated the deposit of shares into a brokerage account that he controlled and sold those shares into the public market.  Padilla allegedly opened that brokerage account in the name of an entity that he controlled.  In 2012, Padilla consented to a final judgment that, among other things, imposed a three-year penny stock bar and permanently enjoined him from violating Sections 5(a) and 5(c) of the Securities Act.  In a Commission administrative proceeding in 2012, Padilla agreed to the entry of an order barring him from the brokerage industry.

10.     **Kevin C. Dills**, age 66, is a United States citizen and a resident of Carlsbad, California.  He resides within walking distance of Padilla's Carlsbad residence.  On March 21, 2023, Dills was indicted for conduct related to his conduct alleged herein.  *United States v. Padilla, et al.*, 1:23-cr-10075-RGS (Dkt. No. 38).  From July 1993 to October 1999, Dills was registered with Del Mar Financial Services, Inc., a registered broker-dealer that Dills owned.  He was registered with other broker-dealers from 1989 to 1992.  In 1999, the Commission brought an administrative proceeding against Dills for a scheme to promote a stock to his brokerage

customers in exchange for kickbacks.  The Commission subsequently barred Dills from the brokerage industry.

## RELIEF DEFENDANTS

11.    **Bright Star International, Inc.** is a Wyoming corporation that was, at all relevant times, controlled by Dills, with a principal place of business in Carlsbad, California. Bright Star received proceeds from the scheme on behalf of Dills.

12.    **Life Sciences Journeys, Inc.** is a Wyoming corporation that was, at all relevant times, controlled by Dills, with a principal place of business in Carlsbad, California.  Life Sciences Journeys also received proceeds from the scheme on behalf of Dills.

13.    **Carlos Hernandez** is a Florida resident and a friend of Padilla.  Hernandez's brokerage accounts generated net proceeds of $49,940 from trading in securities associated with Padilla's scheme.

14.    **Jamie Quick** is a Florida resident and Hernandez's ex-wife.  Quick's brokerage account generated net proceeds of $44,159 from trading in securities associated with Padilla's scheme.

15.    **Ashley Robinson** is a California resident who shared an address with Padilla in Carlsbad, California.  Padilla and Robinson socialized with Hernandez and Quick.  Robinson's brokerage accounts generated net proceeds of $74,355 from trading in securities associated with Padilla's scheme.

16.    **Arlene Sandoval** is Padilla's cousin and is a California resident.  Sandoval's brokerage account generated net proceeds of $263,904 from trading in securities associated with Padilla's scheme.

## RELEVANT INDIVIDUALS AND ENTITIES

17.     **Valor Capital** was incorporated in the Cayman Islands in 2017 and registered with the Cayman Islands Monetary Authority as a broker-dealer by no later than January 2020. Padilla directed illegal selling activity through brokerage accounts that were held at Valor Capital in the names of other individuals but that were controlled by Padilla.

18.     **An individual referred to herein as "Individual A"** is a Latvian individual of unknown whereabouts who has long been Padilla's right-hand man.  Individual A maintained a Valor Capital email address, directed Valor Capital's trading activity, and acted as a liaison with Valor Capital's introducing broker-dealer in Canada.

19.     **An individual referred to herein as "Trader A"** was a registered representative of a registered broker-dealer throughout the 2020-2022 period of Padilla's scheme.  He was a stock trader involved in making a market in securities traded in the over-the-counter market (as opposed to stock traded on exchanges like the New York Stock Exchange).  Market makers in over-the-counter securities publish quoted prices at which they are willing to buy or sell a security, and provide liquidity to investors by buying and selling shares.

20.     Padilla enlisted in his scheme four Russian nationals (**the "Russian Individuals"**) who had personal relationships with Padilla.  Each of the Russian Individuals was the named holder of a Valor Capital account, as well as Russian bank accounts that Padilla used to distribute proceeds of the scheme to Dills.  Another individual (**"Individual B"**) was Padilla's housekeeper and personal assistant at his home in Mexico.   Padilla also made Individual B the named holder of a Valor Capital account, and he also used bank accounts in her name to send proceeds of the fraud to Dills.  The Russian Individuals and Individual B were each "Padilla Nominees" as that term is used herein.

21.     **Cannonau Corp. ("Cannonau")** is a Nevada corporation with a principal place of business in East Syracuse, New York.  Its stock is quoted on the OTC Markets under the symbol CNNC.  Cannonau purports to be in the business of wellness products related to cannabidiol (CBD).

22.     **CGS International, Inc. ("CGS International")** is a Nevada corporation with a principal place of business in the Philippines.  Its stock is quoted on the OTC Markets under the ticker symbol CGSI.  CGS International claims to be in the business of manufacturing an organic agricultural fertilizer product.

23.     **Charlestowne Premium Beverages, Inc. ("Charlestown Beverages")** is a Nevada corporation with its principal place of business in Henderson, Nevada.  On January 7, 2020, Charlestowne Beverages changed its name from 1st Prestige Wealth Management, Inc.  Charlestowne Beverages' stock is quoted on the OTC Markets under the symbol FPWM.  Charlestowne Beverages claims to be in the business of manufacturing cannabis-infused beverages.

24.     **GBX International Group, Inc. ("GBX International")** is a Nevada corporation with its principal place of business in Omaha, Nebraska.  Its stock is quoted on the OTC Markets under the ticker symbol GBXI.  GBX International claims to be in the business of providing marketing and advertising services.

25.     **Oncology Pharma, Inc. ("Oncology Pharma")** is a Nevada corporation with its principal place of business in San Francisco, California.  Its stock is quoted on the OTC Markets under the symbol ONPH.  Oncology Pharma claims to be a biopharmaceutical company focused on cancer treatment.  Dills was an undisclosed control person of Oncology Pharma.

26.     **SUIC Worldwide Holdings Ltd. ("SUIC Worldwide"), also known as Sino United Worldwide Consolidated Ltd.** is a Nevada corporation with its principal place of business in Flushing, New York.  Its stock is quoted on the OTC Markets under the symbol SUIC.  SUIC Worldwide purports to be in the business of developing and financing technological initiatives.

27.     **Xtreme Fighting Championships, Inc. ("Xtreme Fighting")** is a Nevada corporation with its principal place of business in Miramar Beach, Florida.  Its stock is quoted on the OTC Markets under the symbol XFCI.  Prior to July 2020, Xtreme Fighting was known as Duke Mountain Resources, Inc. and was quoted under the symbol DKMR.  Xtreme Fighting purports to be a sports and media company related to mixed martial arts.

## BACKGROUND

28.     The stock involved in the scheme was "penny stock," which generally refers to companies with low market capitalizations, and with stock that trades at less than $5 per share.  It included "restricted stock" that was originally issued by a company (the stock's "issuer") in a private transaction that was not registered with the Commission.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  Such registration statements are often filed with the Commission on Form S-1 and are often referred to as "S-1 registration statements."  S-1 registration statements contain important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  They also disclose any person or group who is the beneficial owner of more than 5% of the company's securities.

29.    An "affiliate" of an issuer is a person or entity, like Dills, that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct the management and policies of the company in question.  Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with, or has common control of, an issuer.  As used herein, the term "Control Persons" means people or a group of people who collectively were an "affiliate" of an issuer.

30.    "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace, including by having previously been subject to a registration statement. Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  When a control person buys publicly-traded or otherwise unrestricted shares in a company s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold to the public at any one time absent registration. Affiliates holding stock quoted on the over-the-counter market cannot sell more than one percent of the issuer's outstanding stock in a three month period.  Dills sold shares of Oncology Pharma, through Padilla, in amounts that exceeded this quantity limitation.

31.    A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether shares are restricted from resale.

32.     The Over-the-Counter ("OTC") Market is a stock quotation service that facilitates public trading of shares in small companies that are not listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).  Stock traded on the OTC Market is often thinly traded, meaning it trades at a lower volume and can therefore be susceptible to price manipulation by undisclosed Control Persons, like Padilla's clients, who secretly amass large amounts of stock.

33.     "Public float" refers to the number of shares of an issuer's stock that is on deposit with broker-dealers and available for trading in the marketplace, including on the OTC Market. An issuer's public float is distinct from its total outstanding shares, which also includes restricted stock issued by the company but not available for public trading.

34.     The buying and selling of penny stocks traded on the OTC Market relies on brokerage firms that make a market, such as the firm where Trader A worked.  Traders involved in making a market can facilitate investors' orders during periods of high demand by engaging in short selling, which is selling shares that the market maker does not yet own.  If the market maker can sell short at one price, and later purchase shares at a lower price, the market maker will earn a profit.  Padilla had a secret backchannel arrangement with Trader A to use a trading account at Trader A's brokerage firm to engage in market-making activity for stock being sold in large amounts by Padilla Nominee accounts.

35.     Unlike larger public companies with stock traded on an exchange, which are subject to rigorous public reporting requirements and are researched by professional stock analysts, there is often a dearth of reliable information concerning penny stock companies.  This can make them more susceptible to fraud schemes that disseminate misleading online news

articles or engage in other promotional activity designed to generate investor interest in the stock so that Control Persons like Padilla's "clients" can sell their shares at higher prices.

## OVERVIEW OF THE SCHEME

36.    Padilla's scheme essentially involved three parts:  (i) providing nominee account holders (the "Padilla Nominees") with offshore brokerage accounts for the benefit of his clients, while hiding their identity, to deposit and sell stock; (ii) trading in his own U.S. brokerage account and in the brokerage accounts of friends and family (including at least one of the Russian Individuals and Relief Defendants Hernandez, Quick, Robinson, and Sandoval, and hereafter "the Padilla Group") to profit alongside the scheme and to manipulate stock prices in support of the scheme; and (iii) enlisting in his scheme Trader A to be a ready buyer of the large amounts of stock that Padilla sold for his clients, and to create an appearance of ordinary over-the-counter trading activity.  Padilla carried out his scheme for his own benefit, and for the benefit of his clients or partners who paid him a commission or fee for his illegal services.

*Padilla Nominees*

37.    One of the services that Padilla provided to his clients was to conceal their connection to fraudulent stock sales.  Padilla used front companies or other individuals that acted as nominees to hold and sell stock for his clients.  For the benefit of his clients, Padilla controlled brokerage accounts in the names of Padilla Nominees, including the Russian Individuals and Individual B.  Padilla used his relationship with the Padilla Nominees to further the scheme, such as by having Individual B open a bank account or having a Russian Individual sign stock transfer documents.  In a February 2022 encrypted message, Padilla reminded one Russian Individual to communicate by the Silent Circle messaging application, "[s]o messages can't be used against

us." Silent Circle is an encrypted messaging application that allows users to destroy sensitive messages and permits a sender to destroy a message on the recipient's end.

38.     Padilla arranged for the Padilla Nominee accounts to take deposit and then sell shares of his clients' stock, and then to distribute the proceeds to Padilla's clients. The Padilla Nominees were the named account holders of bank accounts in Russia and Kyrgyzstan. After selling stock in the name of Padilla Nominees, Padilla arranged for the proceeds to be moved to like-named accounts in foreign jurisdictions from which proceeds were returned to his clients. Padilla Nominee accounts also distributed stock selling proceeds via crypto assets, which made the ownership of those proceeds, and their ultimate destinations, more difficult to trace.

39.     Padilla maintained accounts for Padilla Nominees at offshore brokerage firms, including in the Cayman Islands. One such brokerage firm was Valor Capital. Padilla liaised with Valor Capital, mainly through Individual A, to direct activity in Padilla Nominee accounts. Individual A maintained a Valor Capital email address, but Padilla did not communicate with Individual A at that email address and instead communicated with him via secretive messaging applications and using codenames.

*The Padilla Group*

40.     To facilitate deposits and sales of his clients' stock through nominee accounts at offshore brokerage firms, Padilla often traded in the same stocks in his own U.S. brokerage account, or in other U.S. brokerage accounts that he controlled. For example, Padilla would often use U.S. brokerage accounts in the names of one of the Russian Individuals, or owned by relief defendants Hernandez, Quick, Robinson, and Sandoval. Padilla was in frequent communication with Hernandez during the period of the scheme. Hernandez, in turn, had trading authority over Quick's brokerage account. Robinson was Padilla's romantic partner and

lived with him during the period of the scheme.  Sandoval was Padilla's cousin and gave him complete control over her brokerage account.

41.     The Padilla Group's trading in U.S. brokerage accounts included manipulative buying activity intended to generate a false appearance of market interest in the thinly-traded stock.  It was also intended at times to increase the stock price to a minimum required before Valor Capital could deposit and then sell stock.  Specifically, Valor Capital deposited and sold stock through another broker-dealer located in Canada that imposed a minimum price requirement.  Padilla increased stock prices for his clients' sales by having the Padilla Group enter limit buy orders -- offers to buy stock at particular prices -- including at prices above the then-current market price.

42.     The Padilla Group, acting under Padilla's control or at his direction, traded in a coordinated fashion across multiple brokerage accounts.  Padilla Group accounts were at times accessed from the same IP address, including the IP address assigned to Padilla's residence (an IP address is a network address for a device connected to the Internet).  At other times, Padilla accessed brokerage accounts via VPN (a virtual private network) which had the effect of disguising the physical location of his online activity.

43.     Padilla sold shares in his own brokerage account, and arranged for selling in the accounts of others in the Padilla Group, so that they could profit alongside his clients when they sold shares through Padilla Nominees at elevated prices following promotional campaigns or the issuance of press releases.

*Trader A's Role*

44.     When it came time for Padilla to sell stock for his clients from offshore Padilla Nominee accounts, Padilla arranged for Trader A to engage in trading.  At Padilla's request,

14

Trader A used his brokerage firm's own account to create liquidity for the stock that Padilla wanted to sell for his clients during periods of market demand. Trader A sold shares short, meaning that he did not yet have them in his firm's account, with the expectation that he would obtain the shares (to "cover" his short position) at a lower price, resulting in a profit. Trader A understood that he would be able to cover his short position because Padilla promised that he would provide shares to purchase on the market. Trader A and Padilla had an arrangement where Padilla would offer shares (coming from his offshore nominee accounts) at a price below the price at which Trader A sold short, so that Trader A could purchase those shares and make a profit. This arrangement benefited Padilla because Trader A could sell shares to investors in smaller amounts over the course of a trading day, and Padilla then had Trader A as a ready buyer for the large amounts of shares sold by Padilla Nominees.

45.     Trader A traded in the stocks involved in Padilla's scheme only at Padilla's request; Trader A and his firm did not make a market in those stocks other than when prompted by Padilla, and Padilla was not an on-the-books customer of Trader A's brokerage firm.

46.     On certain occasions, Padilla asked Trader A to engage in trading to set particular prices, including to "mark the close" (i.e., to influence the closing price at the end of the trading day).

47.     Padilla did not communicate with Trader A at Trader A's work phone or email address, but instead communicated with Trader A by calling him via Silent Circle or texting him via Silent Circle. Padilla used a codename when communicating with Trader A on Silent Circle.

*Padilla's Distribution of Proceeds to Control Person Clients*

48.     Padilla made overseas banking arrangements through which accounts at Valor Capital distributed proceeds of the scheme to Padilla's clients, including large amounts funneled

through bank accounts in Russia.  In February 2022, the month that ended with Russia invading

Ukraine and the imposition of U.S. and E.U. sanctions, Padilla exchanged numerous messages

with Individual A about Valor Capital's banking arrangements in Russia.

49.     For example, on February 8, 2022, Padilla wrote to Individual A that Padilla had

met with a "straight gangster banker" associated with a Russian bank to arrange banking for

Valor Capital.  Padilla wrote that he used a pseudonym in his communications with the Russian

banker.  On February 14, 2022, Padilla wrote "we still have all this money owed to clients that

we need to get out."  On February 24, 2022, Padilla wrote to Individual A that Valor Capital's

banks in Russia had been sanction by the United States and asked "what we do now?"  On April

4, 2022, Individual A sent Padilla account details for a Valor Capital account at a bank in

Kyrgyzstan.

50.     On August 5, 2022, Padilla wrote to Individual A that "[w]e can get money out of

Russia and send it to clients.  Need convert money to rubles then send it to khazakhstan [sic]

bank.  The[n] our boy will convert it back and send to clients personal accounts around the

world."  Later in August 2022, Padilla became frustrated with Individual A for slowness in

authorizing wires from a Valor Capital account in Kyrgyzstan, writing on August 16, 2022 "I'm

starting to get yelled at by other parties waiting for money" and suggesting that Individual A did

not care enough about "our business."  On August 24, 2022, Padilla wrote to Individual A, "[w]e

are in big need of a wire for a deal and as you can see we have no commissions coming in."

**DILLS'S ROLE IN THE SCHEME: ONCOLOGY PHARMA SHARES**

51.     Dills was an undisclosed Control Person of Oncology Pharma.  From 2019 to

2022, Dills, acting through his front companies Bright Star and Life Sciences, was nearly the

only source of funding for Oncology Pharma's operations.  Dills also exerted influence over

Oncology Pharma's management.  Among other things, Dills caused management to issue press releases on particular days, with the press releases containing positive information intended to make Oncology Pharma's shares more appealing to investors.

52.     Dills also caused Oncology Pharma to indemnify its transfer agent for the transfer of stock.  Transfer agents generally require guaranteed signatures on stock transfer documents to limit their liability and losses if a signature turns out to be forged.  In lieu of a guaranteed signature, transfer agents may accept an indemnification from the company that issued the stock being transferred.  Dills used his influence over Oncology Pharma to cause it to indemnify its transfer agent for transfers of shares involving Dills and Padilla Nominees.

53.     Dills acquired Oncology Pharma stock not in his own name but instead in the name of Bright Star and Life Sciences.  In an effort to avoid legal limits on stock resales by control persons, Dills in early 2020 installed his then-girlfriend as nominal president of Life Sciences.  Dills told her that he needed to distance himself from Life Sciences to avoid certain legal requirements.  Dills, however, continued to control Life Sciences' activities and continued to control its Oncology Pharma shares.

54.     As part of the scheme, Dills transferred Oncology Pharma shares to Padilla Nominees.  Padilla then caused the Padilla Nominees to deposit the Oncology Pharma shares at Valor Capital and then sell the shares during periods of increased investor demand.  Increased investor demand for Oncology Pharma shares coincided with Dills using his influence over Oncology Pharma to have it issue press releases with positive company news, on particular days.  Padilla received from Valor Capital recaps of Oncology Pharma trading in various accounts.

55.     After the Padilla Nominees sold the Oncology Pharma shares during periods of increased investor demand, the Padilla Nominees delivered proceeds of the scheme from

accounts in their name in Russia and Kyrgyzstan to Dills via accounts in the names of Bright Star and Life Sciences.  In this manner, Dills received approximately $20 million from the scheme.  Padilla maintained records of the Padilla Nominees' payments to Dills.

56.     Dills communicated with Padilla during the course of the scheme by telephone and via Silent Circle using codenames.  Dills communicated with Oncology Pharma's transfer agent by the mails and by email.

57.     Dills first transferred Oncology Pharma shares to a Padilla Nominee as part of the scheme in February 2020.  This initial transfer to a Padilla Nominee involved 12.5 million shares that Oncology Pharma had issued to Bright Star in December 2019.  The 12.5 million shares represented approximately 9 percent of Oncology Pharma's then-outstanding shares and approximately 40 percent of its shares on deposit with broker-dealers and available for public trading (the public float).  Oncology Pharma's transfer agent issued the shares to Bright Star without a restrictive legend, meaning that they were available for resale to the public.  The transfer agent relied, at least in part, upon a representation from an attorney who reviewed the transaction that Bright Star was not an affiliate or "insider" of Oncology Pharma.  In February 2020, Bright Star purportedly sold the shares to a Padilla Nominee, one of the Russian Individuals, for $62,500.  Dills sent records to Oncology Pharma's transfer agent supporting the supposed sale.  One of those supporting documents was an image of bank account activity purporting to show the Russian Individual's payment for the shares.  However, the image of the bank account activity that Dills sent to the transfer agent was falsified -- the actual February 2020 bank statement for Bright Star's account reflects no such payment.  The Russian Individual's shares were later deposited at Valor Capital, and accounts at Valor Capital sold 8.2 million of those shares from April 30, 2020 through May 18, 2020.  In late April and early May

2020, Oncology Pharma stock was subject to an email stock promotional campaign. For instance, a stock promotion email dated May 4, 2020 declared that Oncology Pharma "could be the next biopharma stock poised to EXPLODE!" and that its share price could increase "Up to 344%!"

58.     Oncology Pharma carried out a reverse stock split on October 9, 2020, which had the effect of reducing its amount of shares, and it then issued new shares to its CEO and others. On October 22, 2020, Oncology Pharma issued 2 million shares to Dills's entity Bright Star, from conversion of a portion of a convertible note. On October 27, 2020, Oncology Pharma issued 1 million shares to Dills's other entity, Life Sciences, from conversion of a note that Bright Star had purportedly sold to Life Sciences. In October 2020, Dills's girlfriend was the nominal president of Life Sciences, but it was really controlled by Dills. The 3 million combined shares issued to Bright Star and Life Sciences, and controlled by Dills, represented over 10 percent of Oncology Pharma's then-outstanding stock.

59.     On November 24, 2020, Bright Star sold its 2 million shares to a Padilla Nominee, one of the Russian Individuals, for $50,000. On December 1, 2020, Life Sciences sold its 1 million shares to another Padilla Nominee, another Russian Individual, for $25,000. In January 2021, the two Padilla Nominees transferred their combined 3 million shares to accounts at Valor Capital. Email addresses in the name of the Padilla Nominees communicated with Oncology Pharma's transfer agent concerning these transfers of shares.

60.     Contemporaneous with the January 2021 deposits into the Valor Capital accounts of the Padilla Nominees, Padilla caused the Padilla Group to begin trading in Oncology Pharma. In the thirty days leading up to January 19, 2021, Oncology Pharma's daily trading volume averaged 1,294 shares. On January 19, 2021, Padilla (through relief defendant Arlene

Sandoval's account) purchased 5,300 shares with limit buy orders at escalating prices during the day.  Padilla also coordinated limit buy orders that day in brokerage accounts belonging to Quick and one of the Russian Individuals, and Oncology Pharma's stock price closed at $1.09 per share--an increase of over 135% from the prior trading day.  Padilla accessed both his and the Russian Individual's brokerage accounts that day from Cabo San Lucas, Mexico.  The trades that day in accounts of both Sandoval and the Russian Individual included their accounts buying shares at a price of $0.75 at the exact same time -- 12:27 p.m., on January 19, 2021.

61.     A Padilla Nominee account, and another account at Valor Capital to which the Padilla Nominee had transferred shares, began selling Oncology Pharma shares on January 28, 2021.  Trader A was the buyer for a large portion of those sales, covering shares he had sold short at prices as high as $7.49 per share to innocent investors.  A Padilla Nominee account at Valor Capital sold 13,300 Oncology Pharma shares that day at $5.10 per share and Trader A purchased the same amount of shares at the same price.

62.     Also on January 28, 2021, Oncology Pharma issued a press release for the first time since August 2020.  In the January 28, 2021 press release, Oncology Pharma announced the appointment of a new Chief Financial Officer.  Dills sent a message to an individual at Oncology Pharma that day, writing "[w]hen you announce new CFO change Corp officers on Yahoo."

63.     In August 2022, Padilla complained to Individual A about needing funding to pay for marketing of Oncology Pharma.  He wrote to Individual A on August 15, 2022 "marketing has stopped because we can't get payment out."  On August 16, 2022, Padilla wrote to Individual A "really need this ONPH money to pay out people and get marketing . . . this has stalled me and last week I informed you how important it was."  On August 18, 2022, Padilla

wrote, "I have stalled a campaign now from Non payment and this money needs to go out like last week."  On August 23, 2022, Padilla wrote, "I still can't pay for marketing."

64.     In 2021 alone, known Padilla Nominee accounts and other accounts at Valor Capital sold over 7 million shares of Oncology Pharma for proceeds of well over $100 million. Padilla Group accounts also sold Oncology Pharma shares during 2021, with Sandoval netting $37,361 and Quick netting $23,879.

65.     Dills, by dividing his ownership of Oncology Pharma stock between two front companies, transferring shares to Padilla Nominees, and then sharing in the proceeds of the Padilla Nominees' illegal sales to the public, purposely flouted the registration requirements of federal securities law.  Before selling stock, control persons are required to: (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the volume of stock a control person can legally sell.  There were no registration statements filed or in effect, nor was there an exemption to registration, for the offers and sales of Oncology Pharma stock from Dills to the Padilla Nominees or from the Padilla Nominees to the public.

66.     Dills's sales of Oncology Pharma shares exceeded the volume limitation of Rule 144, which restricts sales by an affiliate over a three-month period to one percent of the shares outstanding for shares quoted on the OTC Market.  In February 2020, Dills purported to sell to Padilla Nominees (on the basis of a falsified bank record) shares obtained in the name of Bright Star in December 2019 in an amount that was approximately 9 percent of Oncology Pharma's then-outstanding shares.  In November and December 2020, Dills sold to Padilla Nominees

shares that Bright Star and Life Sciences had obtained in October 2020, in an amount that represented nearly 15 percent of Oncology Pharma's then-outstanding stock.

67.     Padilla, through the Padilla Nominees, acted as an underwriter for the unlawful distribution of Oncology Pharma shares to the public.

68.     In addition to the Oncology Pharma transactions described above, Dills transferred over 7 million additional shares, also derived from convertible notes held by Bright Star or Life Sciences, to Padilla Nominees between mid-2021 and mid-2022.  On two different occasions, one in 2021 and another in 2022, Dills transferred shares to two Padilla Nominees -- a Russian Individual and Individual B -- on the same day.

## ADDITIONAL EXAMPLES OF PADILLA'S SCHEME

*Charlestowne Beverages*

69.     In December 2019, Charlestowne Beverages issued 2.5 million shares of stock to Wellesley Holdings Ltd. ("Wellesley"), and in January 2020 it issued another 2.5 million shares to Porrima Ltd. ("Porrima").  Together, the 5 million shares represented 97 percent of the public float of Charlestowne Beverages, and 12 percent of its total outstanding shares.  Wellesley and Porrima were nominees utilized by Padilla clients Timothy Page and his son Trevor Page. Padilla and Individual A knew Trevor Page and talked about him in encrypted messages, using one of Trevor Page's favored codenames.  In September 2021, the Commission charged Timothy Page, Trevor Page, Porrima, Wellesley, and others with a scheme to fraudulently sell stock of issuers other than Charlestowne Beverages.  *SEC v. Timothy Page, et al.*, Civil Action No. 1:21-cv-05292 (E.D.N.Y.).

70.     The 2.5 million shares issued to Wellesley and the 2.5 million shares issued to Porrima were both converted from the same convertible note and issued without restrictive

legends.  Charlestowne Beverages' transfer agent issued the shares to Wellesley and Porrima without restrictive legends based on an attorney opinion letter stating that neither of them was an affiliate, including because neither of them owned as much as 10 percent of Charlestowne Beverages' outstanding shares.  Ownership of 10 percent of a company's outstanding shares is often deemed a threshold for determining insider status for purposes of issuing shares with or without restricted legends.  In reality, the Pages controlled the full 5 million shares and thus over 10 percent of Charlestowne Beverages' shares.  Had the Pages been truthful about their control over the 5 million shares, they would have been unable to obtain the Charlestowne Beverages shares without restrictive legends.

71.     The Pages' Charlestowne Beverages shares were deposited in accounts at Valor Capital.  The 2.5 million Porrima shares were deposited at Valor Capital in January 2020, but in an account in the name of one of the Russian Individuals.  The Wellesley shares were deposited in a Valor Capital account in the name of Wellesley in October 2020.  The shares were then divided up among other accounts at Valor Capital via internal transfer, including transfers on February 18, 2021 from Wellesley's account to accounts in the name of two Padilla Nominees.

72.     Charlestowne Beverages stock traded on February 12, 2021 with a closing price of $0.36 per share on a trading volume of 219 shares, and then did not trade at all from February 13, 2021 through February 17, 2021.  Then, beginning on February 18, 2021, Padilla caused the Padilla Group to generate trading volume and increase the price of Charlestowne Beverages shares.  Padilla traded in his own account and traded in the accounts of others associated with him or directed others to trade in Charlestowne Beverages.  Specifically:

a.      On February 18, 2021 at 12:49 p.m., Robinson's brokerage account entered a limit buy order for 1,000 shares at $0.60 per share.

b.      Two minutes later, at 12:51 p.m., Sandoval's brokerage account placed a limit buy order for 5,000 shares, at $0.80 per share.

c.      Also at 12:51 p.m., Robinson's brokerage account placed a limit buy order for 3,000 shares at $0.80.

d.      At 12:52 p.m., one of the Russian Individual's brokerage accounts was accessed from an Internet address in the Dominican Republic.  The account entered a limit buy order for 2,000 shares at $0.80.  The account then entered another order for 1,000 shares at $0.84.

e.      At 12:54 p.m., Sandoval's brokerage account placed a limit buy order for 2,000 shares at $0.85.

f.      At 12:59 p.m., Quick's brokerage account placed a limit buy order for 2,500 shares at $1.00.

g.      At 1:43 p.m., Padilla logged into his brokerage account from the same Internet address in the Dominican Republic from which the Russian Individual's account was accessed at 12:52 p.m.  At 1:44 p.m., Padilla placed a limit buy order in his own account for 500 shares at $1.30.  At 1:45 p.m., he placed another limit buy order in his own account for 500 shares at $1.30.  Several minutes later, at 1:49 p.m., he placed yet another limit buy order in his own account for 1,200 shares at $1.80.

73.     Trader A also traded in Charlestowne Beverages at Padilla's request.  On February 18, 2021 at 1:01 p.m., Trader A's brokerage firm published a quoted price for Charlestowne Beverages shares for the first time.

74.     Charlestowne Beverages' price increased to as high as $1.80 during the trading day on February 18, 2021, before closing at $0.90, compared to a closing price of $0.36 on the prior trading day.  Charlestowne Beverages' trading volume on February 18, 2021 was 25,000 shares, of which 17,709 shares were purchased at progressively increasing prices in Padilla Group Accounts.  There was no market event on February 18, 2021 to explain the sudden increase in trading -- Charlestowne Beverages made no public disclosures or press releases, and in fact its last press release was months earlier on July 29, 2020.

75.     The next trading day, February 19, 2021, there were 200 Charlestowne Beverages' shares traded in the market, and its price closed for the day at $1.25.  Quick's account bought 100 of the shares, at a price of $1.25.

76.     On February 25, 2021, accounts at Valor Capital sold shares of Charlestowne Beverages, assisted by Padilla's arrangement with Trader A.  Valor Capital routed its trades through an account in its own name at a United Kingdom broker-dealer, selling 28,000 shares that day at a price of $1.97 per share.  Trader A (through his proprietary account at his brokerage firm) bought 28,000 shares at $1.97 to cover his short sales to innocent investors at $2.00.

77.     Overall, accounts at Valor Capital sold at least 2,312,245 shares of Charlestowne Beverages for proceeds of at least $7 million between February 22, 2021 and April 19, 2021. The accounts at Valor Capital that sold Charlestowne Beverages shares included Padilla Nominee accounts, and other accounts that received a portion of the shares from the Page nominees via internal transfers.  Accounts of Padilla, and Relief Defendants Quick, Robinson, and Sandoval also sold during this period.  Padilla's personal brokerage account netted trading proceeds of $57,106, Quick netted $6,819, Robinson netted $12,860, and Sandoval netted $23,240.

78.     On March 1, 2021, Charlestowne Beverages became the subject of a promotional campaign.  For instance, on March 1, 2021, a promotional email from pennystockbargain.com described Charlestowne Beverages as a "momentum stock" that was going up in price.  It wrote, "[w]e have reason to believe that Charlestowne Premium Beverages Inc. (Symbol: FPWM) is primed to rocket **1000-1500% in the very short term**. Here is a golden opportunity to make some easy profits and realize some dreams you never thought possible."  On April 15, 2021, Charlestowne Beverages was described in an online article by "the-financialnews.com" as being "Poised to Jump Over 700%."  The-financialnews.com also published promotional articles regarding other stocks involved in Padilla's scheme, including Cannonau and GBX International.

79.     During the month of March 2021, Charlestowne Beverages' share price rose from a closing price of $2.60 on March 1, 2021 to a closing price of $7.25 on March 31, 2021.  During that month, accounts at Valor Capital, including Padilla Nominee accounts and other accounts that received shares from the Page nominees, sold a total of over 700,000 Charlestowne Beverages shares, for proceeds of over $3.2 million.

*Xtreme Fighting Championships*

80.     Xtreme Fighting was formerly known as Duke Mountain Resources.  At the end of 2019, Duke Mountain Resources described itself as a mineral exploration company that in 2014 had ceased operations and was "currently a non-operating shell company."  Duke Mountain Resources described its business purpose, as of the end of 2019, to be "to serve as a vehicle to effect a merger, exchange of capital stock, asset acquisition, or other business combination."

81.     On January 22, 2020, Duke Mountain Resources filed a public report announcing the resignation of an individual who had served as Chief Executive Officer, Chief Financial Officer, and Director of the company, and the election of a new individual as CEO and Director.

26

Duke Mountain Resources also announced that its majority shareholder had sold a controlling interest in the company to the new CEO/Director.

82.    Just before announcing the change of control on January 22, 2020, Duke Mountain Resources on January 14, 2020 issued 20 million shares without restrictive legends to an entity called Emerald Coast Investments, Inc. ("Emerald Coast").  According to records of Duke Mountain Resources' transfer agent, on January 24, 2020, Emerald Coast sold 15 million of the shares to Valor Capital (i.e., to Valor Capital itself, rather than a particular account holder at Valor Capital).  On January 27, 2020, Valor Capital took deposit of the 15 million shares, in the name of an account of a Padilla Nominee.  The 15 million shares represented approximately 7% of Duke Mountain Resources' outstanding shares.

83.    On January 23, 2020, Padilla caused the U.S. brokerage accounts in his own name and in relief defendant Quick's name to purchase shares of Duke Mountain Resources for the first time.  Trader A also began trading in Duke Mountain Resources shares, for the first time, on January 23, 2020.

84.    In a quarterly report for the quarter ending March 31, 2020, Duke Mountain Resources announced that on January 30, 2020, it had entered into a Securities Purchase Agreement to acquire 800,000,000 shares of Xtreme Fighting Championships, Inc.  In a quarterly report for the quarter ended June 30, 2020, the company announced that in connection with a change in control, the "Company acquired the rights to Xtreme Fighting Championships, Inc., the largest independent mixed martial arts organization in the world.  On July 3, 2020, the Company changed its name to Xtreme Fighting Championships, Inc."

85.    Among the Padilla Group, accounts of Padilla, Quick, and Robinson traded shares of Duke Mountain Resources/Xtreme Fighting in 2020, with Padilla netting $16,185, Quick

netting $1,960, and Robinson netting $1,272. They did not trade any shares of the company in 2021 or the first quarter of 2022. Accounts at Valor Capital sold at least 8,998,684 shares of the company in 2020, for proceeds of $5.9 million. Accounts at Valor Capital did not sell any shares in 2021 or the first quarter of 2022. Trader A traded shares of the company in 2020, but did not trade at all in 2021 or the first quarter of 2022.

86.     On January 12, 2022, Xtreme Fighting issued 10 million unrestricted shares to an entity named Marlin Media, Inc. On March 11, 2022, Marlin Media transferred 10 million shares of Xtreme Fighting to an entity named Smith Corona SA de CV ("Smith Corona"). On April 5, 2022, Smith Corona purported to transfer its 10 million shares, not to an account at Valor Capital, but to Valor Capital itself. On April 27, 2022, Valor Capital deposited the 10 million shares in an account it held in the name of the entity Bangatron SA de CV ("Bangatron").

87.     Smith Corona and Bangatron were each either a Padilla client or a Padilla nominee for a client. Both Smith Corona and Bangatron were named account holders at Valor Capital. Padilla and Individual A exchanged encrypted messages in 2022 concerning the distribution of trading proceeds to Smith Corona. Padilla received information from Valor Capital concerning Xtreme Fighting trading in accounts in the name of Smith Corona and Bangatron. On March 1, 2022, Padilla and Individual A exchanged messages concerning Valor Capital wiring money to a Smith Corona account. Padilla asked if he could "make up a smith Corona email." That day, the email address contacto@smithcorona.info sent a wire request to Valor Capital. On July 19, 2022, Individual A wrote to Padilla that Padilla needed to provide a "fresh notarized passport and proof of address" for the director and ultimate beneficial owners of Smith Corona and Bangatron, and "fresh dd [due diligence] docs" for the companies.

88.     On April 11, 2022, Individual A sent an encrypted message to Padilla about increasing Xtreme Fighting's share price to meet a requirement for deposit at Valor Capital's clearing firm in Canada; that day, Trader A traded in Xtreme Fighting for the first time in over a year.  On April 26, 2022 -- the day before Valor Capital took deposit of the 10 million shares in an account in the name of Bangatron -- Trader A commented to Padilla on Xtreme Fighting market activity on April 25, 2022.  Padilla responded "that was us trying to get it to close above $0.70."  Padilla Group accounts of Hernandez and Sandoval both entered limit buy orders for Xtreme Fighting Championships shares on April 25, 2022 and its closing price that day was $0.84 per share.  In an encrypted message on April 25, 2022, Padilla wrote to Individual A, "[w]e are good…Closed at .84."  Xtreme Fighting closing price the prior trading day, April 22, 2022, was $0.28 per share.

89.     In May 2022, the Bangatron account at Valor Capital sold approximately 150,000 shares of Xtreme Fighting for proceeds of approximately $100,000.

90.     On or about May 24, 2022, Xtreme Fighting became the subject of a promotional campaign.  One such promotional article, dated May 24, 2022, described Xtreme Fighting's stock as being poised to "Soar Over 600%."  On May 24, 2022, Bangatron sold 1,000 shares at $0.75 per share.

*CGS International, Inc.*

91.     Two Mexico-based entities, Desarrollos Immobilliarios Borlam SA de CV ("Desarrollos") and Pusker SA de CV ("Pusker"), were either additional nominees of Padilla or Control Person clients of Padilla.  Both Desarrollos and Pusker were named account holders at Valor Capital.  On January 26, 2022, Padilla exchanged an encrypted message with Individual A regarding account opening forms for an offshore account for Desarrollos at a Cayman entity

other than Valor Capital.  On July 18, 2022, Padilla and Individual A exchanged encrypted messages concerning a pending Valor Capital deposit for an account in the name of Pusker, with Padilla writing "I can move pr[i]ce tomorrow."

92.     CGS International issued 1.4 million shares to Pusker on September 22, 2021 and 1.5 million shares to Desarrollos on September 24, 2021.  CGS International issued another 1.6 million shares to a third Mexican entity, Farland Caput SA de CV ("Farland"), on September 27, 2021.  On October 7, 2021, CGS International issued 2.2 million additional shares each to Desarrollos, Pusker, and Farland.  Following the October 7, 2021 issuance, Desarrollos, Farland, and Pusker held approximately 7 percent of all outstanding shares of CGS International.  Later in October 2021, Desarrollos, Pusker, and Farland deposited shares of CGS International with offshore entities other than Valor Capital.

93.     On November 16, 2021, shares of CGS International traded for the first time since November 8, 2021.  Its closing price on November 8, 2021 was $4.97.  On November 16, 2021, Padilla caused one of the Russian Individual's accounts to enter limit buy orders and purchase 110 CGS International shares at a price of $6.96.  Later that day, Padilla used Sandoval's account to enter limit buy orders and purchase 100 shares at $7.00.  CGS International's stock price closed at $5.65 per share on November 16, 2021.

94.     The next day, November 17, 2021, Padilla caused Hernandez to enter limit buy orders in one brokerage account and ultimately purchase 100 shares of CGS at $9.00 per share, and to purchase 1,000 shares in a different brokerage account at $7.01 per share.  Also on November 17, 2021, Trader A's firm first began quoting CGS International.  CGS International's stock price closed at $7.04 per share on November 17, 2021, a 25 percent increase from the prior day.

95.     On November 18, 2021, CGS International's stock closed at $14.90, a 112 percent increase from the prior trading day.  Accounts of Trader A, Hernandez, Sandoval, and one of the Russian Individuals each traded in CGS International that day.

96.     Padilla caused the Padilla Group to sell CGS International shares during late 2021 and early 2022, coinciding with sales from offshore accounts in the names of Pusker and Farland.  The Sandoval account sold 83,100 shares of CGS International between November 29, 2021 and March 18, 2022, for net proceeds of $136,837.  A Robinson account sold 13,100 shares of CGS International between December 14, 2021 and February 4, 2022, for net proceeds of $44,496.  A Hernandez account sold 29,800 shares of CGS International between November 18, 2021 and March 21, 2022, for net proceeds of $51,614.

97.     The Padilla Group's sales in late 2021 and early 2022 coincided with a series of press releases from CGS International announcing various positive corporate developments.  For instance, on November 22, 2021, CGS International announced that it had formed an operating subsidiary for production of its organic fertilizer product.  On December 14, 2021, CGS International announced its first sales agreement for its organic fertilizer product.  On December 20, 2021, it announced its first purchase orders.  Sandoval's account and one of the Russian Individual's accounts sold shares at prices as high as $25.90 per share, Hernandez sold at a price as high as $18.97 per share, and Robinson sold at a price as high as $14.90.

*GBX International, Inc.*

98.     Accounts at Valor Capital sold 1.9 million GBX International shares for proceeds of $6.7 million between September 8, 2021 and January 12, 2022.  A Valor Capital account in the name of a Russian Individual first deposited 7.5 million shares of GBX International on June 17, 2021, then representing 98 percent of the public float.  One or more accounts at Valor Capital

first sold shares on September 8, 2021.  Trader A also began trading in GBX International on September 8, 2021 at Padilla's request.  On September 13, 2021, Padilla traded in or caused trading in GBX International stock in accounts in the names of one of the Russian Individuals and Sandoval.  Those accounts entered limit buy orders for GBX International shares on September 13, 2021, both purchasing at $4.39 per share.  The Sandoval account also purchased an additional 1,958 shares at a price of $4.40 per share.

99.     On September 16, 2021, GBX International was the subject of an online promotional article describing it as "the next stock which is poised to soar 1,000%."  The article was published by the-financialnews.com, the same website that published promotional articles concerning Charlestowne Beverages and Cannonau.

100.     Accounts of one of the Russian Individuals and Sandoval both sold GBX International shares on September 21, 2021 at $9.98 per share.  The Sandoval account also sold 2,000 shares at a price of $14.00, and one of the Russian Individual's accounts sold at a price as high as $12.00.  Sandoval netted $28,461 from GBX International trading in her account.

101.     From September 16, 2021 through September 29, 2021 one or more accounts at Valor Capital sold over 320,000 GBX International shares for proceeds of over $3 million at an average price of $9.46 per share.  GBX International's share price at the beginning of September was $2.00 per share.

*Cannonau Corp.*

102.     A Valor Capital account in the name of Bangatron received a deposit of over 10.5 million Cannonau Corp. shares on February 9, 2021, representing approximately 4.4 percent of its outstanding shares.  Accounts at Valor Capital thereafter sold 10.5 million Cannonau shares for proceeds of $12.5 million between February 11, 2021 and July 22, 2021.  Valor Capital

transferred shares from the Bangatron account to other accounts, including to an account in the name of one of the Russian Individuals on February 18, 2021.

103.    At Padilla's request, Trader A first traded in Cannonau on February 16, 2021. Cannonau stock closed at $2.00 per share on February 16, 2021.  On February 17, 2021, Padilla traded in the account of Sandoval and caused trading in the account of one of the Russian Individuals, with both accounts entering limit buy orders for Cannonau shares on February 17, 2021 at $2.50 per share.  Cannonau's closing price on February 17, 2021 was $2.46 per share. Accounts in the names of Quick, Robinson, Sandoval, and one of the Russian Individuals each entered limit buy orders for Cannonau shares on February 19, 2021, and each purchased shares at $3.50 per share.  Cannonau's closing price on February 19, 2021 was $3.45 per share, compared to a closing price on February 18, 2021 of $3.00 per share.

104.    On April 29, 2021, Cannonau was the subject of a promotional article on the-financialnews.com -- the website that had also promoted Charlestowne Beverages in April 2021 and GBX International in September 2021 -- claiming that "This Stock Could Explode 900%."

105.    Padilla netted $20,490 from trading in Cannonau in his own account, Quick netted $8,455, Robinson netted $3,100, and Sandoval netted $12,598.

*SUIC Worldwide Holdings Ltd.*

106.    A Valor Capital account in the name of Bangatron took deposit of 2.5 million shares of SUIC Worldwide on February 5, 2021.  A Valor Capital account in the name of Smith Corona took deposit of 1 million shares of SUIC Worldwide on April 17, 2021.

107.    The 3.5 million shares deposited between the Bangatron and Smith Corona accounts at Valor Capital in February and April 2021 together represented 83 percent of SUIC Worldwide's public float and 10 percent of all of its outstanding stock.

33

108.     On February 5, 2021, the day of the Bangatron deposit at Valor, Padilla caused a U.S. brokerage account in the name of one of the Russian Individuals to enter limit buy orders and purchase 215 shares of SUIC Worldwide at $0.50 per share.  Padilla also entered limit buy orders in Sandoval's brokerage account and purchased 2,100 SUIC Worldwide shares at $0.60 per share on February 8, 2021.  At Padilla's request, Trader A began trading in SUIC for the first time on February 8, 2021.

109.     Bangatron's account at Valor Capital transferred 1.3 million SUIC Worldwide shares to one of the Russian Individual's accounts at Valor Capital on March 5, 2021.  On March 16, 2021, the Russian Individual's account transferred 1.2 million of the shares to another Valor Capital account.

110.     From April 13, 2021 through May 25, 2021, SUIC Worldwide published at least nine press releases announcing various corporate developments.  During this period, accounts at Valor Capital sold 1.8 million SUIC Worldwide shares for proceeds of approximately $18 million.  Accounts in the names of members of the Padilla Group also sold SUIC Worldwide shares during this period.  Padilla netted proceeds of $45,903, Robinson netted $12,627, Sandoval netted $26,240, and Quick netted $2,733.

111.     Padilla was aware of upcoming marketing activity related to SUIC Worldwide. He possessed an April 15, 2021 Silent Circle message from "SinoGroup2020" stating "So do we still needs news for next Tuesday? or Thursday?"  Padilla, or another unknown participant in the message exchange, wrote "Tuesday The Oracle news please."  On Tuesday, April 20, 2021, SUIC Worldwide issued a press release announcing a collaboration with Oracle Taiwan LLC.

## FIRST CLAIM FOR RELIEF
## <u>FRAUD IN THE OFFER OR SALE OF SECURITIES</u>

### Violations of Sections 17(a)(1) and (3) of the Securities Act
### (Padilla and Dills)

112.    Paragraphs 1 through 111 above are re-alleged and incorporated by reference as if fully set forth herein.

113.    By reason of the conduct described above, the Defendants, directly or indirectly, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

114.    By reason of the conduct described above, the Defendants violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

## SECOND CLAIM FOR RELIEF
## <u>FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES</u>

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder
### (Padilla and Dills)

115.    Paragraphs 1 through 111 above are re-alleged and incorporated by reference as if fully set forth herein.

116.    By reason of the conduct described above, the Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud;

and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

117.    By reason of the conduct described above, the Defendants violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a), (c)] thereunder and will continue to violate that section and those rules unless enjoined.

### THIRD CLAIM FOR RELIEF
### <u>UNREGISTERED OFFERINGS OF SECURITIES</u>

**Violations of Sections 5(a) and 5(c) of the Securities Act
(Padilla and Dills)**

118.    Paragraphs 1 through 111 above are re-alleged and incorporated by reference as if fully set forth herein.

119.    By reason of the conduct described above, Defendants, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, one or more of the securities identified in Paragraphs 51-68, as to which no registration statement has been filed.

120.    As a result, Defendants violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a) and (c)] and will continue to violate those sections unless enjoined.

## FOURTH CLAIM FOR RELIEF
## AIDING AND ABETTING

### (Violation of Section 15(b) of the Securities Act by Dills)

121.    Paragraphs 1 through 111 above are re-alleged an incorporated by reference as if fully set forth herein.

122.    By reason of the conduct described above, Padilla, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, recklessly, or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

123.    Dills knowingly or recklessly provided substantial assistance to Padilla in his violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

124.    As a result, Dills violated Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## FIFTH CLAIM FOR RELIEF
## AIDING AND ABETTING

### (Violation of Section 20(e) of the Exchange Act by Dills)

125.    Paragraphs 1 through 111 above are re-alleged and incorporated by reference as if fully set forth herein.

126.    By reason of the conduct described above, Padilla, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a

fraud or deceit upon any persons, including purchasers or sellers of the securities.

127.    Dills knowingly or recklessly provided substantial assistance to Padilla in his violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

128.    As a result, Dills violated Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**SIXTH CLAIM FOR RELIEF**
**OTHER EQUITABLE RELIEF, INCLUDING**
**UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST**

**(As to Relief Defendants)**

129.    Paragraphs 1 through 111 above are re-alleged and incorporated by reference as if fully set forth herein.

130.    Section 21(d)(5) of the Exchange Act states, "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

131.    Relief Defendants received ill-gotten funds by means of a fraudulent stock selling scheme.  Relief Defendants have no legitimate claim to this property.  In equity and good conscience, Relief Defendants should not be allowed to retain such funds.

132.    As a result, Relief Defendants are liable for unjust enrichment and should each be required to return their share of ill-gotten gains, in an amount to be determined by the Court. The Court should also impose a constructive trust on the ill-gotten gains in the possession of Relief Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

**I.**

Enter a Final Judgment permanently enjoining Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§77e(a), (c) and §77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5(a) and (c)];

**II.**

Enter a Final Judgment ordering Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(5) and (7)];

**III.**

Enter a Final Judgment imposing civil money penalties upon Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

**IV.**

Enter a Final Judgment prohibiting Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)]; and

**V.**

Enter a Final Judgment barring Defendants from directly or indirectly, including, but not limited to, through an entity owned or controlled by either of them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

**VI.**

Enter a Final Judgment ordering Relief Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon; and

**VII.**

Granting such other and further relief as this Court deems just and proper.

**<u>JURY DEMAND</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

DATED: June 13, 2023.

Respectfully Submitted,

/s *Michael C. Moran*
Michael C. Moran (Mass. Bar No. 666885)
Kathleen B. Shields (Mass. Bar No. 637438)
Amy S. Gwiazda (Mass. Bar No. 663494)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: 617-573-8931 (Moran)
           617-573-8904 (Shields)
Fax:    617-573-4590
MoranMi@sec.gov
ShieldsKa@sec.gov