UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH A. PADILLA and KEVIN C. DILLS,<br><br>Defendants,<br><br>and<br><br>BRIGHT STAR INTERNATIONAL, INC., LIFE SCIENCES JOURNEYS, INC., CARLOS HERNANDEZ, JAMIE QUICK, ASHLEY ROBINSON, AND ARLENE SANDOVAL,<br><br>Relief Defendants. | Case No. 23-cv-11331-RGS |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THE PREJUDGMENT INTEREST COMPONENT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST RELIEF DEFENDANTS CARLOS HERNANDEZ AND JAMIE QUICK**

The Commission submits this memorandum in accordance with the Court's order of February 25, 2025, to address the issue of prejudgment interest that was left open by the Court's ruling that granted, in part, the Commission's motion for summary judgment against relief defendants Carlos Hernandez and Jamie Quick. *See* Dkt. Nos. 90, 88. The Court's ruling stated that the Court would "decline to award prejudgment interest pending clarification by the SEC of the identity of the alleged victims and the amount of each victim's loss that is attributable to these relief defendants," and referred to 34 victims that had been previously noted by the Commission. *See* Dkt. No. 88.

As explained below, the Court should award prejudgment interest without a list of

particular victims' losses that could be compensated under a plan of distribution, and the Court's suggestion that each victim's loss must be "attributable" to Quick and Hernandez implies an unwarranted limitation on the settled law of prejudgment interest. The Court should exercise its discretion to award prejudgment interest because Quick and Hernandez clearly had the benefit of their ill-gotten gains over time, thus justifying the award of interest on top of their disgorgement amounts. Awarding prejudgment interest in these circumstances is appropriate because that interest can be added to all defendants' and relief defendants' disgorgement amounts and returned to harmed investors as part of a distribution plan that will be submitted for the Court's approval once the Commission has been able to collect funds from the defendants and relief defendants.

## Factual Background

In its summary judgment order, the Court stated that the Commission had "identified 34 specific victims and seeks disgorgement for the benefit of these individuals." Dkt. No. 88, last ¶. While the Court is correct that the Commission's summary judgment reply brief referenced 34 victims who had been identified as part of the U.S. Attorney's Office's ("USAO") request for restitution in the related criminal case, those victims are only examples of some harmed investors in two of the seven securities for which the Commission sought, and the Court awarded, disgorgement. By way of explaining that the Commission would later seek the Court's approval for a plan of distribution, the Commission stated that "[a]s of April 2024, the Department of Justice had identified 34 victims of the Oncology Pharma and Charlestowne Beverages schemes alone, with combined losses of over $3.2 million" and provided a cite to docket entries in the Padilla criminal case pending before this Court. *See* Dkt. No. 78 at 11. As described in additional briefing in the related criminal case, and in an amended list of victims, the USAO

amended its loss figure for those 34 victims to approximately $2.8 million. *See United States v. Padilla*, No. 23-cr-10075, Dkt. No. 196, at 2, Dkt. No. 196-1 (filed Apr. 15, 2024).

As explained in the USAO's briefing in support of its motion for restitution, its loss calculation included individuals who purchased shares of Oncology Pharma or Charlestowne Beverages during the periods of Padilla's fraud, who lost money on those purchases, and who did not purchase the shares in order to participate in a "speculative short squeeze." *Id.*, Dkt. No. 196 at 7-8. It did not rely solely on trading data because of the potential impact of short selling on those securities, and in the course of developing its estimates, it reached out directly only to investors with estimated losses over the threshold of $90,000. *See United States v. Padilla*, No. 23-cr-10075, Dkt. No. 183, at 5-7 (filed Mar. 15, 2024); *see also id.*, Dkt. No. 196 at 9-14 (filed Apr. 15, 2024) (explaining why short interest in Oncology Pharma and Charlestowne Beverages stock likely had little impact on the stocks' prices). Each of the investors whose losses were identified by the USAO made their purchases of Oncology Pharma and Charlestowne Beverages within the time period when the defendants in this case were involved in a fraudulent scheme to trade in those securities, which scheme used trading in Quick's and Hernandez's brokerage accounts to manipulate prices. *See* Declaration of Kathleen Shields, filed herewith, ("Shields Dec."), ¶¶4-5.

In addition to the investors' losses in Oncology Pharma and Charlestowne Beverages for which restitution was requested by the USAO, there may be other investors' losses in those securities,[1] and additional investors' losses in other securities, who may be eligible for

---

[1] Because the criminal case dealt with a narrower scope of misconduct than the Commission's case, the "Relevant Period" of the fraud that the USAO used was shorter than the period of time that the Commission would likely propose as part of a Distribution Plan to determine whether investors were victims of the fraudulent conduct. Specifically, the prosecutors used a "relevant period" for the Oncology Pharma fraud of January 19, 2021 to July 7, 2021, and a "relevant period" for the Charlestowne Beverages fraud of February 18, 2021 to April 19, 2021. *See*

3

compensation as part of any distribution plan to be recommended by the Commission in this case. In determining whether it would seek to distribute funds to Oncology Pharma or Charlestowne Beverages investors other than those proposed to receive restitution from the criminal case, the Commission would likely consider investors who bought those securities over a longer period of time, and those whose losses were under the dollar threshold employed by the USAO. Overall, the pool of investors that would likely be considered for inclusion in a Commission distribution fund would include those who invested in the following securities during the following time periods:

| Security Name | Security Ticker | Relevant Period |
|---|---|---|
| Cannonau Corp. | CNNC | 2/16/21 to 7/21/21 |
| CGS International | CGSI | 11/16/21 to 7/22/22 |
| Charlestowne Beverages | FPWM | 2/18/21 to 5/5/21 |
| GBX International | GBXI | 5/3/21 and 9/8/21 to 1/11/22 |
| Oncology Pharma | ONPH | 1/19/21 to 7/28/22 |
| SUIC Worldwide | SUIC | 2/8/21 to 6/29/21 |
| Xtreme Fighting/Duke Mountain Resources | XFCI/DKMR | 1/23/20 to 12/31/20 and 4/11/22 to 5/10/22 |

The Commission determined these time periods primarily by examining the time periods during which James Anglim traded in these securities. *See* Declaration of Maxwell Clarke ("Clarke Dec."), filed herewith, ¶4. Anglim was a market maker who traded in the securities that were part of Padilla's fraudulent scheme pursuant to an arrangement with Padilla. *See* Declaration of James Anglim (Dkt. No. 60), ¶¶5-7. Because Anglim traded in these seven stocks only pursuant to his arrangement with Padilla, and only at his request, the time periods of Anglim's trades are a reasonable proxy for the time periods of the fraudulent scheme described

---

*United States v. Padilla*, No. 23-cr-10075, Dkt. No. 183, at 2. Certain investors identified by the USAO incurred losses as a result of their investments in Oncology Pharma securities that were outside the "relevant period" utilized by the USAO but would be within the relevant period proposed by the Commission herein. *See* Shields Dec., ¶6.

4

in the Complaint.  *See id.*, ¶7.  Further, all but one of the specific trades in Quick and Hernandez's accounts, for which the Court has awarded disgorgement against them, fall within these time periods.[2]  *See* Commission's Statement of Undisputed Facts, Dkt. No. 58, ¶¶32, 35, 37, 38, 42, 46, 47, 49-51, 54-56, 60-63, 67, 68, 70-71, 74-76, 78-79, 82-85, 87-88, 90, 93.  As the Commission demonstrated to obtain summary judgment, the trades in Quick and Hernandez's accounts for which disgorgement was awarded were part of Padilla's deceptive trading in each of these securities.  *See* Dkt. No. 88, ¶3 ("the record compels the conclusion that the profits they obtained from selling that stock resulted from Joseph Padilla's fraudulent scheme to raise artificially [] stock prices").

In order to identify investors with net losses who invested in the securities other than those examined in detail by the USAO, during the time period of Padilla's fraud, the Commission has collected and begun its review of market trading data, which are commonly referred to as "Blue Sheets."  *See* Clarke Dec., ¶8.  While additional analysis of these Blue Sheet data and other records will be necessary before the Commission is in a position to propose a plan of distribution to this Court, the Commission's analysis shows that, at a minimum, over 41,000 retail investors incurred harm as a result of their purchases of the securities of Cannonau, CGS International, GBX International, SUIC Worldwide and Xtreme Fighting during the period of the fraud.  *See id.*, ¶¶5, 8-14.  These estimates are inherently conservative because they do not reflect trading by institutional or corporate investors, or retail investors who trade through omnibus accounts or other financial intermediaries, and also do not reflect complete Blue Sheet records

---

[2] There is one relevant trade in Quick's account outside the period of Anglim's trades.  On May 3, 2021, Quick's account purchased GBX International shares.  Quick's trade occurred on the same day that another account used by Padilla in furtherance of his scheme also purchased GBX International shares, and after a period of more than a month when GBX International's shares did not trade at all.  *See* Dkt. No. 58 (Commission's Statement of Undisputed Facts), ¶93.

for CGS International. *See id.*, ¶¶6-7. Together, these more than 41,000 retail investors suffered losses of over $63.9 million as a result of their trading in the securities manipulated by Padilla during the periods of his fraud. *See id.*, ¶5. As a result, any distribution plan that the Commission may recommend is likely to include a notice and claims procedure, where other investors who can document their losses from investments during these time periods will be able to seek a share of the sums that are available for distribution.

## ARGUMENT

**A.    Settled Law On Prejudgment Interest Supports Such an Award Here.**

Courts determining whether to award prejudgment interest consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (internal citation omitted). "In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance." *Id.; see also SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) (Congress intended anti-fraud provisions of the securities laws to be "construed . . . flexibly to effectuate [their] remedial purposes").

Here, it is consistent with the remedial purposes of the securities laws to order prejudgment interest against Hernandez and Quick, where the Court has found that they received ill-gotten gains from Padilla's fraud. Indeed, "because the purpose of disgorgement in the context of relief defendants is to deprive the third-party associates, friends and family of those who violate federal securities laws of ill-gotten profits, it is appropriate to account for the prejudgment interest attributable to such profits." *SEC v. Collectors Coffee, Inc.*, 19 Civ. 4355,

6

2025 WL 752221, at *17 (S.D.N.Y. Mar. 10, 2025) (internal citation omitted; ordering prejudgment interest against relief defendant who received ill-gotten gains from spouse's securities fraud); *see also SEC v. Knox*, C.A. No. 18-12058-RGS, 2022 WL 1912877, at *4, *6 (D. Mass. June 3, 2022) (awarding prejudgment interest against entities that retained unlawful gains and ordering prejudgment interest against relief defendants).

It is equitable to order prejudgment interest against Hernandez and Quick to return them to the position they would have been in absent Padilla's fraud. Without prejudgment interest, Hernandez and Quick will have had free use of fraudulent proceeds, putting them in a better position than harmed investors. *See SEC v. Druffner,* 802 F. Supp. 2d 293, 298 (D. Mass. 2011) ("prejudgment interest is necessary to prevent defendants from receiving the benefit of what would otherwise be an interest-free loan"). Prejudgment interest accounts for the cost of borrowing, which Hernandez and Quick would have had to pay in a legitimate funding arrangement. *See First Jersey,* 101 F.3d at 1476 (holding IRS underpayment rate used for prejudgment interest in SEC cases "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud."); *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 566 (S.D.N.Y. 2009) ("prejudgment interest is necessary to capture the full measure of the defendant's ill-gotten gains."). Prejudgment interest is appropriate, whether Hernandez and Quick spent their ill-gotten gains or invested it. *See SEC v. Sharp*, 737 F. Supp. 3d 66, 94 (D. Mass. June 17, 2024) ("The very act of obtaining and retaining ill-gotten funds is enough for defendants to benefit from what resembles an interest-free loan: a showing that the Defendants used ill-gotten funds to make more money out of it is not necessary.").

The Court has also awarded prejudgment interest, pursuant to consent judgments, against the other defendants and relief defendants in this case, and it would be unfair for Hernandez and Quick to benefit uniquely from the equivalent of an interest-free loan. *See* Dkt. Nos. 17-19, 46, 49, 54.

Further, the need to compensate harmed investors in this case is high. Padilla's fraud took place over many years and involved multiple stocks. The USAO has identified numerous victims of Padilla's Oncology Pharma and Charlestowne Beverages schemes. *See supra*, page 3. The Commission's preliminary analysis has found more than 41,000 individual retail investors, in a conservative analysis, who purchased the other stocks involved in Padilla's scheme, and who suffered combined harm of over $63.9 million, who could also have claims for compensation as victims. *See* Clarke Dec., ¶5.

**B.    Prejudgment Interest Awards Should Not Depend on a Specific List of Harmed Investors.**

For the Court to award disgorgement and prejudgment interest, it is not necessary for the Court to find a causal link between victim losses and the relief defendants' gains. As the First Circuit recently observed in the context of disgorgement, "the causal connection required is between the amount by which the defendant was unjustly enriched and the amount they can be required to disgorge." *SEC v. Navellier*, 108 F.4th 19, 42 (1st Cir. 2024) (quoting *SEC v. Banner Fund, Int'l,* 211 F.3d 602, 617 (D.C. Cir. 2000)). Where, as here, investors were harmed, there need not be a causal link between the disgorgement amount and the investor loss. *Id*. at 41 n.14. Indeed, in the First Circuit, defrauded investors need not necessarily "suffer pecuniary harm as a precondition to a disgorgement award." *Id.* Instead, disgorgement is appropriate where it will "do more than simply benefit the public at large" and will "remedy a direct harm" to investors. *Id.*

Here, the award of prejudgment interest, like disgorgement, is intended to remedy harm to investors. It is enough that Hernandez and Quick were unjustly enriched during Padilla's scheme while investors suffered losses, without linking the relief defendants' ill-gotten gains to any particular harmed investors. *See SEC v. Putnam*, 2:20-cv-00301, 2024 WL 4135684, at *15 (D. Utah Sept. 10, 2024) ("nothing in the [Exchange Act] or in [*Liu v. SEC,* 591 U.S. 71, 74 (2020)] suggests that before ordering disgorgement, the SEC must prove the identity of, and amount owed to each and every wronged investor. Rather, *Liu* suggests that a constructive trust is an appropriate equitable remedy, which would not require *ex ante* proof of victims' identities."). There is ample evidence of investor harm resulting from the scheme. *See* Clarke Dec., ¶5. Nothing more is required.

**C.    The Commission's Typical Distributions Process Will Be Followed in This Case Once The Commission Has Collected All Available Funds.**

To date, the Commission has collected approximately $542,000 that may be used to reimburse investors for their losses. *See* Shields Dec., ¶7. Many of the defendants' and relief defendants' judgments provide for additional payments over time, with post-judgment interest, and the Commission's collections efforts are ongoing, so this sum may increase. *See, e.g.,* Dkt. Nos. 17, 19, 46, 81. The funds collected to date are being held in an interest-bearing account at the U.S. Department of the Treasury. Even if the Commission collects the entire $1,449,889 that has been ordered to date (accounting for offsets for sums due to the USAO), only a small percentage of the over $63 million in investor losses will be compensable. *See* Dkt. Nos. 17-19, 46, 81, 91, 92; Clarke Dec., ¶5. Given the disparity between the amounts likely to be collected in this case and the investors' losses, every dollar ordered in recoveries (including prejudgment interest), and collected from the defendants and relief defendants, will be important to

compensating harmed investors, and any distribution plan will, by necessity, make judgment calls about who is compensated.

All of the Final Judgments that the Court has issued in this case that require payments to the Commission provide that the Commission may propose a plan for this Court's approval to distribute the collected funds. *E.g.* Dkt, No. 19 at 7 ("The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provision of Section 308(a) of the Sarbanes-Oxley Act of 2002."). Consistent with the Commission staff's prior representations to this Court, the Commission intends to use funds ordered and collected for the benefit of harmed investors. To the extent it is helpful to the Court at this stage, the Commission provides below a high-level overview of the ordinary steps it would take to seek the Court's approval for such a distribution to investors once it has a reasonable idea the total of funds that will be collected.

1. **Feasibility Determination by the Staff**

The first step in any distribution process is to determine whether a distribution is feasible. The Commission staff considers, among other factors, the amount of funds ordered and collected or expected to be collected in the future, the availability of investor information, whether investor harm is quantifiable, and the cost of administering a distribution. In this case, based on Blue Sheet data, investor information is available and quantifiable. However, the Commission will need a plan to minimize the administrative costs of a distribution, which would likely include the costs of a distribution agent to manage a notice and claims process, as well as a tax administrator to manage the tax obligations of the distribution fund. Options for minimizing costs may include contributing some or all of the Commission's collections to any criminal restitution fund that is established, or proposing a distribution to investors in the securities with

the greatest losses.

### 2. Seeking Court Approval to Establish a Fair Fund

The creation of a Fair Fund is a precursor to proposing that the Court approve a plan to distribute any collected civil penalties, along with collected disgorgement and prejudgment interest, to victims of the fraud. The Fair Fund mechanism allows civil penalties to be distributed to harmed investors along with disgorgement and prejudgment interest and thus maximizes investor recovery.

### 3. Appointment of a Tax Administrator

Once the Commission staff has determined that a distribution is feasible and the Court has created a Fair Fund, the Commission staff will recommend that the Court appoint a Tax Administrator. A distribution fund (whether it consists solely of disgorgement and prejudgment interest, or also includes civil penalty money) constitutes a Qualified Settlement Fund (QSF) under section 468B(g) of the Internal Revenue Code, 26 U.S.C. §468B(g), and related regulations, 26 C.F.R. §§1.468B-1 through 1.468B-5.

### 4. Selection and Appointment of a Distribution Agent

When the number of potential payees is large, as it is here, and a notice and claims process is necessary to identify harmed investors, the Commission typically engages a third-party distribution agent that specializes in investor outreach, handling claims, and making payments. Generally, distribution agents work with Commission staff to develop a proposed distribution plan, to oversee any administrative matters related to communications with investors and processing of claims, coordinate with the Tax Administrator to ensure compliance with the Fair Fund's tax obligations, prepare accountings of the Fair Fund, maintain accurate records concerning the Fair Fund, and oversee the distribution of the Fair Fund to investors. The

Commission staff selects distribution agents through a rigorous and competitive process. Once a distribution agent is selected, the Commission presents its selection to the Court and asks the Court to appoint the distribution agent to oversee the distribution.

### 5. Development of a Distribution Plan

Once the Court appoints a distribution agent, the distribution agent and Commission staff draft a proposed distribution plan. The distribution plan identifies the investors who are eligible to participate in the distribution and the relevant period and describes the claims process and the calculation of losses and distribution payments. The Commission then seeks Court approval of the distribution plan. *See, e.g., Official Committee of Unsecured Creditors of Worldcom, Inc. v. SEC*, 467 F.3d 73, 81-83 (2d Cir. 2006) ("[u]nless the consent decree specifically provides otherwise[,] once the district court satisfies itself that the distribution of proceeds in a proposed SEC disgorgement plan is fair and reasonable, its review is at an end").

### 6. Notice and Claims Process

If the distribution plan is approved by the Court, the distribution agent then conducts the distribution according to the approved plan. The distribution agent will likely notify harmed investors identified through the Blue Sheet trading records, and in recognition of the fact that not all investors' transactions are captured in the Blue Sheets, and that the contact information in the Blue Sheets may be stale, the distribution agent will likely notify the public through various other public online channels. *See* Clarke Dec., ¶6. As part of the claims process, the distribution agent will collect from each investor information about his or her claim and will evaluate whether the claimant meets the qualifications for compensation set forth in the distribution plan.

### 7. Preparation of a Payment File and Disbursing Payments

After the notice and claims process is complete, the distribution agent will prepare a

payment file listing the claimants who are eligible to receive a distribution payment, the amount of their calculated losses, and the amount of their distribution payments, as determined by the terms of the plan and the funds then available for distribution. The Commission will then seek the Court's approval to disburse the Fair Fund to the harmed investors who were determined to be eligible for payment. Based on the Commission's experience in similar cases, the distribution process takes approximately two years after the full amount of ordered remedies are collected (or a determination is made that no further collections are likely) and a distribution plan is approved by the Court. This amount of time is necessary to locate and notify investors, permit investors sufficient time to respond, resolve disputes, calculate losses and distribution payments, disburse funds, and satisfy reporting obligations to the Court.

## **CONCLUSION**

As explained above and in its original summary judgment briefing, the Commission respectfully requests that the Court order that Hernandez pay prejudgment interest of $8,767, and that Quick pay prejudgment interest of $8,826, and amend the judgments entered against them accordingly, in the form of the proposed judgments filed herewith.

Dated: March 21, 2025                    Respectfully submitted,

                                         SECURITIES AND EXCHANGE COMMISSION
                                         By its attorneys,

                                         */s/ Kathleen Burdette Shields*
                                         Michael C. Moran (Mass. Bar No. 666885)
                                         Kathleen Burdette Shields (Mass. Bar No. 637438)
                                         Securities and Exchange Commission
                                         33 Arch Street, 24th Floor
                                         Boston, MA  02110
                                         Phone: (617) 573-8900
                                         Facsimile: (617) 573-4590
                                         Email:  moranmi@sec.gov
                                                  shieldska@sec.gov

## CERTIFICATE OF SERVICE

  I hereby certify that on March 21, 2025, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case. A copy will also be sent via first class mail and/or email to those parties who have not yet registered for notice via the Court's CM/ECF system.

                /s/ *Kathleen Burdette Shields*
                Kathleen Burdette Shields